# EXHIBIT 1

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**Case No.: 1:25-cv-80338-Dimitrouleas/Reinhart**

JACK D. HERNANDEZ *d/b/a* OCEAN VIBES MUSIC PUBLISHING, and DICK ALFREDO CABALLERO RODRIGUEZ *a/k/a* ALFR3D BEATS,

Plaintiffs,

v.

UMG RECORDINGS, INC. *d/b/a* UNIVERSALMUSIC GROUP *d/b/a* UNIVERSAL MUSIC LATINO, CAROLINA GIRALDO NAVARRO *a/k/a* KAROL G, EDWIN VASQUEZ VEGA *a/k/a* MALDY, MARVIN HAWKINS RODRIGUEZ *a/k/a* DJ MAFF, JULIO MANUEL GONZALEZ TAVAREZ *a/k/a* LENNY TAVEREZ, and JUSTIN QUILES,

Defendants.
___________________________________________/

**EXPERT REPORT OF DR. JOE BENNETT**

CONFIDENTIAL

## I. <u>Introduction & Summary</u>

I am a forensic musicologist with 17 years' experience in analyzing, transcribing and evaluating musical works. I am currently a professor at Berklee College of Music in Boston, Massachusetts and the resident musicologist for BBC Radio in the UK and internationally. I was awarded a National Teaching Fellowship (NTF) in 2004 by the UK Higher Education Academy in recognition of my contribution to the teaching and learning of popular music. I am a Fellow of the Higher Education Academy, a peer reviewer for Bloomsbury, OUP and IASPM, and a PhD examiner specializing in songwriting creativity. Prior to my current role, I was Vice President of Academic Affairs at Berklee, and formerly Dean at Boston Conservatory (USA) and Bath Spa University (UK).

I have written and co-written published books and peer-reviewed journal articles regarding music analysis, methodologies in music research, and other scholarly areas related to music. My qualifications and experience, including the matters in which I have provided testimony, are more fully described at **Appendix A**.

This report has been prepared for the purpose of providing an expert opinion in the matter of Jack D. Hernandez *d/b/a* Ocean Vibes Music Publishing and Dick Alfredo Caballero Rodriguez *a/k/a* Alfr3d Beats v. UMG Recordings, Inc. *d/b/a* Universal Music Group *d/b/a* Universal Music Latino, Carolina Giraldo Navarro *a/k/a* Karol G, Edwin Vasquez Vega *a/k/a* Maldy, Marvin Hawkins Rodriguez *a/k/a* DJ Maff, Julio Manuel Gonzalez Tavarez *a/k/a* Lenny Tavárez and Justin Quiles (the "<u>Action</u>").

At issue in the Action is Plaintiffs' contention that "Gatúbela," featuring Karol G and Maldy, infringes the underlying composition of Plaintiff's musical work, "Punto G." Specifically, Plaintiffs' Complaint alleges that "by every method of analysis, *Gatúbela* is a forgery – copied from Alfr3d, who created, produced and published his original song entitled *Punto G* …, more than six weeks earlier." (*See* Complaint, ¶ 3).

The Complaint further provides that a "highly regarded musicology expert"[1] has "carefully compared" "Gatúbela" and "Punto G" and found that "both the main synthesizer riff and vocal chorus melody of Gatúbela are extremely similar to the synth melody of [Punto G]; such similarity would not have occurred by chance alone; and such similarities cannot be explained away by prior art." (*Id.*, ¶ 7). According to Plaintiffs' expert musicologist "the level of similarity between Gatúbela and [Punto G] is 'one we almost never see.'" (*Id.*, ¶ 8).

I have been engaged to analyze and address the Complaint's allegations of the supposed similarities between the "Punto G" and Gatúbela" (collectively, the "<u>Works</u>") and the contention that the similarities contained in the Works cannot be explained by prior art.

I have also been requested to determine what percentage of "Gatúbela's" success is attributable to similarities with "Punto G." Specifically, I have looked at all factors that have contributed to

[1] Because Plaintiffs have not been yet provided the musicologist's expert report, I reserve the right to provide an additional rebuttal to the expert report.

"Gatúbela's" success in order to provide a quantitative and qualitative assessment of the impact of the alleged infringement.

## II. Compensation.

I am compensated in this matter at a rate of $400 (USD) per hour, except that my time for testifying in depositions or at trial, should that be necessary, will be billed at the hourly rate of $475 (USD) per hour. My compensation is not dependent on my opinions or on the outcome of the Action.

## III. Methodology.

I have completed a comparative musicological analysis of the compositions in: (a) Plaintiffs' "Punto G," which I have been advised was composed by Alfr3d and "first published" on July 12, 2022;[2] and (b) "Gatúbela" which I understand was released on August 22, 2022 and performed by Karol G and Edwin Vasquez Vega *p/k/a* Maldy. The purposes of my comparative musicological analysis include:

1. assessing whether alleged similarities between the main synthesizer riff and vocal chorus melody of the Works are significant from a musicological perspective;

2. assessing whether there is musicological evidence that expression from "Punto G" is copied in "Gatúbela";

3. researching whether any alleged similarities between the Works exist in "Prior Art" (for purposes of this report, "Prior Art" refers to musical compositions that predate the July 2022 publication of "Punto G");

4. filtering out the expression that represents musical building blocks and commonplace elements found in prior art; and

5. assessing the expression that remains in "Punto G" after the filtration process described in paragraph 4 above is completed.

In conducting a musicological analysis of the compositions in "Punto G" and "Gatúbela," I employed the following overall methodology.

I imported the audio files for the Works into Digital Audio Workstation software – Ableton Live for Mac – which enabled me to focus on specific details of the underlying audio files for the purposes of detailed listening, tempo detection, melodic transcription, and related analytical activities.

---

[2] My understanding is Alfr3d first published "Punto G" by posting it on YouTube: https://www.youtube.com/watch?v=706OnufqgnU ("Punto G Video"). Alfr3d described the beat as a "reggaeton beat – a Feid type beat." Notably Karol G released an unrelated song also entitled "Punto G" in 2019, which has approximately 177 million Spotify streams and 301 million YouTube views. While perhaps suggestive of Alfr3d's attempt to make a Colombian-infused reggaeton beat, I am not making any inferences based on the identical title.

I also undertook and oversaw a repertoire research to investigate the extent to which the alleged infringing elements contained in "Punto G" are original, and to discount any commonplace elements of the Works (*i.e.*, musical characteristics that appear in a large number of works so are unlikely to be protected by copyright).[i] This is referred to as a "Prior Art" search.[3] Given that loop-based genres – such as reggaeton – often rely on short melodic fragments and other style tropes, I examined prior repertoire to determine whether the allegedly shared melodic fragment appears elsewhere, in pitch and/or rhythm.

I then transcribed the respective melodies using a combination of computer-assisted methods and traditional pen-and-paper transcription skills, then typeset the transcriptions in music notation software – Dorico 6 for Mac. Both Works have been transposed into the key of A minor/C major for ease of comparison,[4] which is a commonly accepted musicological practice.

Subjective similarities in synth timbre, drum pattern, or mix treatment can arise independently through shared production tools and genre conventions. I therefore distinguish between compositional parameters of the melodic fragments (pitch, rhythm, harmony) and production parameters (timbre, instrumentation, and mix), discounting the latter category as irrelevant to the analysis of the underlying Musical Work (and unprotectable by copyright).

## IV. <u>**Summary of Opinions**</u>.

Although there is similarity between the riff and vocal chorus melody of "Gatúbela," on the one hand, and the riff melody of "Punto G," on the other hand, the melodies are not identical. The subjective similarity is exacerbated by a similar commonplace reggaeton beat, and a similar commonplace harmonic rhythm. The short melodic fragment (6 or 7 consecutive pitches) appeared in other songs *before* "Punto G." Accordingly, it is my professional opinion that "Gatúbela" does not copy any original expression from "Punto G."

Additionally, with respect to attribution, the similarity between the Works comprises only 1.89% of "Gatúbela's" total compositional interest. Moreover, "Gatúbela's" commercial success is a

---

[3] I have been informed that the Eleventh Circuit has emphasized the importance of prior art and filtering out commonplace elements in conducting a copyright analysis. *See Compulife Software, Inc. v. Newman*, 959 F.3d 1288, 1306 (11th Cir. 2020) (in a "copyright infringement analysis" the defendant "may seek to prove that some or all of the copied material is unprotectable" and any material proven to be unprotectable "should be filtered out of the analysis before comparing the two works"); *Herzog v. Castle Rock Ent.*, 193 F.3d 1241, 1257 (11th Cir. 1999) (under the extrinsic test, "expert testimony and analytic dissection are appropriate" in aiding a court to determine "whether a plaintiff seeks to protect only uncopyrightable elements…"); *MiTek Holdings, Inc. v. Arce Engr. Co., Inc.*, 89 F.3d 1548, 1554 (11th Cir. 1996) ("Even if the court finds that the putative infringer copied portions of the [plaintiff's work], that is not the end of the inquiry" because "infringement occurs only if one copies protected elements of a copyrighted work").

[4] "Transposition" is the act of transferring music from one key to another, note for note. The relationship of all the notes to one another remains the same. *See* "Transposition" in *The Harvard Dictionary of Music* (Fourth Edition, 2003, Harvard University Press, p. 904) (hereinafter, "*<u>Harvard</u>*").

product of several other factors, including Karol G's star power, past commercial success, marketing of the song, Maldy's performance, and the viral music video. Accordingly, it is my professional opinion that no more than 1.89% of the compositional content in "Gatúbela" could be attributable to the alleged infringement of "Punto G."

## V. Materials Used.

The following materials were used in this report:

1. The audio of "Punto G" identified in Plaintiffs' Complaint, which I downloaded from YouTube and have linked as **Track 1** at https://joebennett.work/PUNTOG.

2. The audio of "Gatúbela" that I was provided by Defendants' counsel and linked as **Track 2** at https://www.joebennett.work/GATUBELA.

3. Prior art (musical compositions that were released before July of 2022) with YouTube links or sheet music, itemized herein.

4. The Musical transcriptions that I created.

5. Plaintiffs' Complaint.

6. For convenience, all audio excerpts are also available in a single cloud-based folder at https://joebennett.work/HERNANDEZ-ASSETS.

# ANALYSIS

## A. Musical Compositions and Basic Terminology.

A musical composition is comprised of certain distinct and identifiable elements that can be analyzed separately and in combination. When analyzing two compositions, some elements are more fundamental than others, namely: (1) structure; (2) harmony; (3) rhythm; (4) melody; and, (5) lyrics (when present).[5]

On the other hand, similarities or differences in the **key** (*e.g.*, if two compositions are in the same key or in different keys but in the same modality, namely both in major keys or both in minor keys), **tempo** (*e.g.*, how fast or slow works are performed), **meter** (*e.g.*, 4/4 time), instrumentation (*e.g.*, the use of guitars, drums, synthesizers, etc.), and **style or genre** (*e.g.*, hip hop, country, etc.) are less or not at all significant insofar as they represent musical building blocks and/or commonplace practices used in countless musical compositions.

Brief definitions of musical terms follow.

---

[5] For example, Ronald S. Rosen writes: "Thus, from the copyright perspective (and in the view of many musical professionals) …the basic elements of music are: melody, harmony, rhythm, and form/structure." Ronald S. Rosen, *Music and Copyright*, Oxford University Press, 2008, p. 156.

(a) **Structure** (*a/k/a* **Form**) is the organization of musical units or musical groups, often dictated by the development of the melody and/or lyrics. The larger sections of songs are generally referred to as "Verses" and "Choruses". The material within Verses and Choruses or sections of a composition consists of "phrases".

(b) **Harmony** refers to the tonal relationship of pitches that sound simultaneously, especially (but not exclusively) with respect to the use and organization of "chords."[ii] A sequence of chords is referred to as a "harmonic (or chord) progression." Chord progressions are commonplace musical building blocks that have been used in music for centuries. "Harmonic rhythm" is the rate of change of chords.[iii]

(c) The **Key** of a musical composition identifies "the tonal center or tonic…defined in terms of the particular major or minor scale from which its principal pitches are drawn."[iv] In addition, *The Harvard Dictionary of Music* (at p. 442) explains that there are two main types of keys, "major and minor." Major and minor keys are musical building blocks.

(d) **Rhythm** refers to the pattern and organization of the time values of sounds and silences as well as the overall rhythmic flow in musical time.[v]

(e) **Melody** is a single line of music that consists primarily of a succession (*i.e.*, a sequence or order) of pitches and the rhythmic timings of those pitches within a melodic phrase structure.

(f) **Bar** (*a/k/a* "measure") refers to a group of beats into which the music is organized. A "bar line" is a vertical line in written music that marks the boundary between one bar and the next. A bar is also known as a "measure" (*i.e.*, four beats worth of music in 4/4 time).

(g) **Pitch** is the specific high or low placement of a musical sound, often identified within a musical scale.[vi] A "Pitch Chain," also referred to as a "Pitch Sequence," is a term used to describe the succession/sequence/order of pitches, independently of their rhythmic timing.

(h) **Lyrics** are the words (or text) that are sung or spoken in a song.

(i) **Riffs** are short fragments of melody that are repeated several times in a song. Riffs are typically between 1 and 4 bars in duration. Riffs are often deliberately simple, functioning as memorable 'hooks' in pop songs.[vii]

(j) **Chord loop** refers to a short chord progression (2-4 chords) that repeats over and over in a composition. It is a common term in popular music scholarship[6] and music industry vernacular.[viii]

## B. <u>Reggaeton</u>.

Reggaeton is a form of dance music popularized in Jamaica, Puerto Rico and Colombia during the 1980s, and developed out of Jamaican Dancehall, Calypso, and Spanish Reggae.

Reggaeton consists of a distinctive 3+3+2 rhythm pattern (*a/k/a* "Three Two Clave"),[ix] played on bass drum and snare drum, repeating every 2 beats in a danceable "boom, ch'boom chik" rhythm. This 2-beat pattern can also be described as a 'habanera' rhythm and is one of the basic building blocks of Afro-Cuban music. The habanera rhythmic pattern is ubiquitous in the genre, and also in genres that pre-date it (Spanish Reggae, Dancehall). The 2-beat pattern is transcribed as follows (repeated, to make a full bar of music):

**Fig. 1 – Reggaeton Bass and Snare Pattern, played twice** [x]




## C. <u>Comparison of the Works</u>.

**Tempo and Key**. "Punto G" is in the key of C#m (C sharp minor). By way of harmonic difference, the entirety of "Gatúbela" is in the key of Bm (B minor). The tempos (*i.e.*, performance speeds) of "Punto G" and "Gatúbela" are also different. The tempo in "Punto G" is 86 beats per minute. The tempo of "Gatúbela" is faster at 95 beats per minute.

| Title | Key | Tempo |
|---|---|---|
| "Punto G" | C♯ minor | 86 BPM |
| "Gatúbela" | B minor | 95 BPM |

[6] Drew Nobile, *Form as Harmony in Rock Music*, Oxford Studies in Music Theory (Oxford University Press, 2020).

**<u>Chord Progressions (key compensated)</u>**[7]

| | | | | |
|---|---|---|---|---|
| "Punto G" | Am | Dm6 | Am | Dm6 |
| "Gatúbela" | Am | F6 | Am | F6 |

Even when compensated for key, as above, the chord progressions are clearly different from each other. The Works share a harmonic rhythm of one chord change per bar, which is one of the most common techniques in all popular music, but are different, in terms of chord type and/or chord inversion.

**<u>Fig. 2 – Topline Melodic Comparison "Punto G" v "Gatúbela" (Riffs)</u>**




Figure two shows the riffs in "Punto G" and "Gatúbela" which are partially similar. The red noteheads indicate exact matches of pitch and rhythm; blue indicates partial or non-exact matches (same pitch, different rhythm); and black indicates no match.

The melodies start at a different point of the bar. "Punto G" begins with a single note of C on the downbeat. Conversely, at this same time, "Gatúbela" has a rest. The Works' only unique alignment appears in the middle of bar one and lasts for a total of three beats – ***or less than two seconds***.

The Works' riffs share five exact non-consecutive matches of pitch and rhythm (red), two matches of pitch only (blue), and seven notes that do not match at all (black). Both riffs share the same seven-note pitch chain: 3-3-3-3-2-1-6 (C-C-C-C-B-A-F).[8]

The riffs' rhythmic characters are similar but non-identical: "Punto G" uses triplet rhythms throughout (*i.e.*, three equal notes are fit into the time normally occupied by two of the same note value). By contrast, the riff in "Gatúbela" includes three syncopated dotted 16th notes.

---

[7] Hereinafter, I will refer to all works and melodies in the same key of A minor for clarity and simplicity. Key transposition is a standard musicological practice. *See Tisi v. Patrick*, 97 F. Supp.2d 539, 545 (S.D.N.Y. 2000) (transposition is an accepted practice for musicological analysis); *Nom Music, Inc. v. Kaslin*, 227 F. Supp. 922, 927 (S.D.N.Y. 1964) ("The transposition of one composition to the key of another for comparison purposes has been recognized as a valid technique and has been termed 'the comparative method.'").

[8] As previously stated, all note names are pitch-compensated into C Major / A minor for clarity of language, in line with standard musicological practice.

The riffs initially follow similar melodic contours: the first part of each riff (bar one) descends stepwise down the natural minor scale, from the minor third (C) to the sixth scale degree of the minor scale (F). In bar two the riffs diverge, and share no notes after the single F on the downbeat.

The Works use slightly similar sounding but musically different chord progressions (*a/k/a* harmony) from each other. Punto G plays a repeating loop of Am-Dm6 (A minor to D minor sixth); Gatúbela plays a repeating loop of Am-F6 (A minor to F major sixth).

**<u>Summary of Comparative Analysis of the Riffs</u>**:

- The riffs are similar but non-identical, consisting of only three beats' worth of partial similarity (1.8 sec), and 0.7 seconds for the exact-match similarity.[9]

The brevity of the shared riff (three beats, with pitch sequences of only six or seven notes) also belies Plaintiffs' purported musicologist's claim that such similarity "would not have occurred by chance alone …". (Complaint, ¶ 7). On the contrary, the fact that the shared riffs are short makes them mathematically more prone to coincidental similarity. In a short melodic fragment, its base-rate of occurrence in music is necessarily higher than for a longer, more information-rich passage; in probabilistic terms, the likelihood of an exact match decreases as additional sequential constraints (notes) are added. This is well established in probability theory and refined by music scholars such as David Huron and David Temperley.[10]

Put simply, coincidental similarity between *short* melodic fragments is more likely than between *longer* melodic fragments. Punto G's riff is exceptionally short – three beats / seven notes, with four repeating notes, and less than two seconds in duration. This is exactly the type of riff that is prone to coincidental partial similarity with other works, and the coincidence hypothesis is, of course, supported further by the fact that we find the pitch sequence in Prior Art, as discussed below.

---

[9] These measurements are replicable and based on slicing the relevant melodic fragment from "Punto G" (sampled at 0:35 in the work's runtime). The longer measurement of 1.8 seconds represents the three-beat, seven-note non-exact match phrase. The shorter measurement of 0.7 second is calculated from the same 0:35 timestamp and represents the only three-note exact-match phrase. Measured using the timeline view in Ableton Live Studio, with a resolution of three decimal places (1000th/sec) and rounded to one decimal place for simplicity and clarity.

[10] David Huron, *Sweet Anticipation: Music and the Psychology of Expectation* (MIT press, 2008); David Temperley, "A Probabilistic Model of Melody Perception," *Cognitive Science: A Multidisciplinary Journal* 32, no. 2 (2008): 418–44, https://doi.org/10.1080/03640210701864089; David Temperley, *Music and Probability* (MIT Press, 2007).

**Fig. 3 – Topline Melodic Comparison "Punto G" v "Gatúbela" (Riff v Topline Melody)**




Figure 3 highlights the similarities between the riff in "Punto G" and the topline (vocal) melody in "Gatúbela" as performed by Karol G. Again, exact matches are indicated in red; partial or non-exact matches of pitch or rhythm (but not both) in blue; and black indicates no match.

Here, the similarity consists of six consecutive pitches, lasting a total of two beats. As previously noted, the riff in "Punto G" begins on the downbeat (beat one of the bar). There is no equivalent note match with the "Gatúbela" vocal.

The "Punto G" riff and "Gatúbela" topline vocal melody align briefly for two beats half-way through bar one, and then are entirely different thereafter. Simply stated, there is only two beats' worth of similarity between them, and they are mostly dissimilar over their two-bar (eight beat) duration.

One pitch correspondence present in Figure 2 – scale degree 6 (F) on beat one of the second bar – does not occur in "Gatúbela's" topline and is therefore absent from Figure 3. The melodies therefore share only a six-note pitch chain 3-3-3-3-2-1 (C-C-C-C-B-A). The absence of this continuation further limits the shared material to a brief opening fragment rather than a complete melodic phrase.

As previously stated, the chord progression (*a/k/a* Harmony) is different between the Works.

**Summary of Comparison Analysis (Riff v Vocal Topline)**:

- The melodies share a six-note pitch chain for two beats but are otherwise dissimilar.

## PRIOR ART ANALYSIS

As noted above, courts emphasize the importance of prior art in conducting infringement analysis. An analysis of prior art is critical in that it can demonstrate that two works were created independently of each other and based either on commonplace or basic music building or pre-existing works now in the public domain.[11]

[11] "Evidence of similar musical phrases appearing in prior works . . . demonstrates that the musical language was of such ordinary and common occurrence that the ***probability of independent, coincidental production was great***." *Gray v. Hudson*, 28 F.4th 87, 100-01 (9th Cir. 2022) (emphasis added). *Accord Alvarez v. Industria del Amor*, No. 98 C 1851, 1999 WL 498610, at *4

By way of example, if a short melodic fragment (a pitch chain, or a chord progression) appears in a variety of earlier works across many genres and decades, it is most likely an example of a musical 'building block' – something that is available to all composers, and therefore not something unique to, or owned by, a copyright infringement plaintiff.

As Forensic Musicology and Law scholar Katherine Leo asserts, prior art is a tool in distinguishing between the unique (*i.e.* protectable) and commonplace (unprotectable) elements.

> Expert analyses often incorporate collections of previously composed music external to the lawsuit to distinguish unoriginal, less valuable commonalities from valuable, protected original content. For example, the frequency of a particular musical passage across repertories can reveal not simply the presence of similarities or dissimilarities, but whether they might be considered substantive evidence of copying […] the context that experts provide courts constitutes practicable evidence to approximate the rarity of a passage as an imperfect means of appraising originality.[xi]

In my own peer-reviewed research I have written:

> Even though musicologists are expert listeners with a wide knowledge of repertoire, we cannot simply state that we believe an element is commonplace or unique - to do so would clearly be *argumentum ab auctoritate* (the Argument from Authority fallacy). To demonstrate to others (e.g. clients, courts, juries) that any similarity between Song A and Song B is coincidental, we must produce evidence that the relevant similar elements do, in fact, appear in other works: ideally but not essentially, works that predate Song A. I shall call this the Prior Art Proxy, where the existence of a musical element in many works demonstrates that it is something that composers might create independently of each other. In my experience, it is most useful when applied to short melodic fragments - typically one to four bars of music.[xii]

As the preceding analysis illustrates, the closest alignment between the Works occurs in a six-note pitch chain 3-3-3-3-2-1 (Figure 3). While the riffs in Figure 2 share a seven-note pitch chain (3-3-3-3-2-1-6), they are rhythmically slightly dissimilar. The Works have different chord progressions.

To contextualize the pitch chains identified in Figures 2–3, I surveyed musical works across a range of genres and dates. My research identified several examples of prior art in which previously existing works included a melody that contains an exact or near-exact match to the relevant scale-degree chain(s). These works are presented in chronological order based on their release year.

Figure 4 below lists a number of works whose melodies contain exact or near-exact matches to the pitch chains identified above (3-3-3-3-2-1 and 3-3-3-3-2-1-6).

- **Red** indicates exact matches of pitch chain.

---

(N.D. Ill. July 9, 1999) (holding that "uncontroverted evidence shows the compositions were independently created" because there were "numerous other musical artists [who] have also independently created songs" in the same realm).

- **Blue** indicates near-matches (*e.g.*, substitutions, insertions, or omissions within the chain).
- **Black** indicates no match.

**Figure 4 – Prior Art Table** [12]

| Title | Artist | Year | Link | Timestamp | Notes/pitch chain |
|---|---|---|---|---|---|
| The Nutcracker Suite Op. 71a: IIa March [BENNETT03] | Pyotr Ilyich Tchaikovsky | 1892 | Spotify | 01:09 | 3-3-3-3-2-1-7-6 |
| Tú me Dijiste Adiós [BENNETT04] | Los Brincos | 1964 | YouTube | 00:11 | 3-3-2-2-1-5 |
| L'Italiano [BENNETT05] | Toto Cutugno | 1983 | YouTube | 01:04 | 3-3-3-3-2-1-6 // Identical Chord progression i - iv |
| Eläköön elämä [BENNETT06] | Sonja Lumme | 1985 | YouTube | 00:22 | 3-3-3-3-2-1-5 |
| Sons and Daughters [BENNETT07] | IRON BELL MUSIC Ft. Joel Gerdis | 2017 | YouTube | 00:12 | 3-3-3-2-1-6 |
| Marrandil [BENNETT08] | Gurrumul | 2020 | YouTube | 00:15 | 3-3-3-3-2-(2)-1-6 |
| Nevo Jerusalem [BENNETT09] | In His Presence Ministries | 2021 | YouTube | 01:01 | 3-3-3-2-1-6 |
| When Will Tomorrow Come? [BENNETT10] | Ian Luxton | 2021 | YouTube | 00:24 | 3-3-3-2-1-6 |
| Un Poblano En Texas [BENNETT11] | Grupo Los Chupetones | 2021 | YouTube | 00:05 | 3-3-3-3-2-1-5 |
| Tsukiyo [BENNETT12] | Chemistry | 2021 | YouTube | 01:00 | 3-3-3-3-2-1-5 |
| Volaré [BENNETT13] | Carmelitas Contemplativos | 2022 | YouTube | 00:20 | 3-3-3-2-1-5 |

Figure 4 illustrates that both pitch chains – 3-3-3-3-2-1 and 3-3-3-3-2-1-6 – are commonplace.

[12] Note on accessing the audio**:** The entire track is hyperlinked from the table in the Link column, with the timestamp shown. The relevant excerpts can be found in the folder BENNETT ASSETS FOR REPORT, which is available online at https://joebennett.work/HERNANDEZ-ASSETS.

**Fig. 5– Prior Art Comparative Transcription**




In Figure 5, I have transcribed a selection of the works listed in Figure 4 and highlighted the similarities between their respective topline melodies. [13]

- Created in 2021, "Nevo Jerusalem" is a near-exact pitch-and-rhythm match with "Punto G." Nevo Jerusalem shares an ***exact*** six-note pitch-and-rhythm match with "Punto G," and contains the same resolution to chord iv (Dm) found in "Punto G."

- "When Will Tomorrow Come?" also created in 2021 shares an ***exact*** six-note pitch chain with "Punto G" (3-3-3-2-1-6).

- Created in 1983, "L'Italiano" shares a near-exact match of the same pitch chain (with the addition of a passing note) as well as an exact harmonic match with "Punto G".

Together with the Prior Art Table in Figure 4, the comparative transcription above illustrates that similar melodies to the riff in "Punto G" exist in pre-existing works, and that this pitch sequence is commonplace and unlikely to be protectable by copyright law, given its numerous antecedents.

## A. Prior Art: Chord Progression

Although the chord progressions in the Works are different, it is nonetheless worth noting that the i–iv minor key chord loop in "Punto G" is a widespread chord change in pop songwriting, including for example:

- Half-Breed – Cher (1973) [0:34] https://joebennett.work/halfbreed73 [BENNETT14]
- Independent Women, Pt. 1 – Destiny's Child (2001) [0:38] https://joebennett.work/independent01 [BENNETT15]

---

[13] All audio is available via the links in this Report, and at https://joebennett.work/HERNANDEZ-ASSETS.

- The Importance of Being Idle – Oasis (2005) [0:55] https://joebennett.work/idle05 [BENNETT16]
- I Didn't Change My Number – Billie Eilish (2021) [0:09] https://joebennett.work/number21 [BENNETT17]

**B. Alfr3d's Creation of a "Carol [sic] G v. Feid type beat"**

As noted in the Complaint, Alfr3d titled the work that he posted on YouTube as "Reggaeton Beat – Carol [sic] G x Feid type beat." (*See* Complaint, ¶ 29). He applied this title "for the specific purpose of making it easy to find for anybody interested in the reggaeton style of music." (*Id.*).

Consequently, Alfr3d seemingly endeavored to create a sound similar to Karol G and Feid, a Colombian reggaeton/Latin-urbano singer.[14] Like Karol G, Feid has a distinctive sound blending R&B, lo-fi hip-hop, and reggaetón.[xiii] Two of the sonic allusions to Feid's work in "Punto G" are:

- the drum part uses the style-typical Reggaeton habanera pattern (as does most of Feid's and Karol G's output); and

- the i-iv chord progression, which is present in Feid's song "VIDEITOXX" (2022).[15]

Plaintiffs' description of "Punto G" and use of a commonplace three-beat melodic fragment as well as a generic drumbeat belies Plaintiffs' assertion that the supposed similarities between "Punto G" and "Gatúbela" "would not have occurred by chance alone." (*See* Complaint, ¶ 7).

**C. Summary of Prior Art Analysis.**

- The riff in "Punto G" has several melodic antecedents.
- "Punto G" uses a generic reggaeton drum pattern.
- The melody in "Punto G" is commonplace.
- The harmony in "Punto G" is commonplace.

In comparing "Punto G" and "Gatúbela," three factors suggest strongly that any similarity is ascribable to prior art or explainable by independent creation.

First, the duration of the similarity is short – only three beats' worth of music in the case of the riffs, and only TWO beats when comparing the riff in "Punto G" to the vocal melody in "Gatúbela." Short fragments are probabilistically (mathematically) more prone to coincidental similarity than longer ones.

Second, the match is non-exact, and partial. There are subtle differences in rhythm and pitch even

[14] Karol G and Feid have been romantically linked and described as a couple since 2023.

[15] https://youtu.be/plV9ZGfolfc?si=d9E_7KoKDs7NzrIw&t=24 – the beat and chords of VIDEITOXX are very similar to "Punto G" at 0:24.

in the similar fragment, and across the entire two bars, the melodies overall are different. The works also have different chords.

Third, the pitch chains (333312 for the vocal, and 3333216 for the riffs) appear in Prior Art, with some similar rhythmic values.

## ATTRIBUTION / APPORTIONMENT

As noted above, I have also been asked to determine what percentage of "Gatúbela's" success is attributable to similarities with "Punto G." Specifically, I have looked at all factors that have contributed to "Gatúbela's" success in order to provide a quantitative and qualitative assessment of the impact of the alleged infringement.

### A. The "Quantitative" Assessment.

#### 1. "Punto G" is an Instrumental Work, Without Lyrics.

"Punto G" is a purely instrumental work; it has no lyrics. In contrast, "Gatúbela" – which translates to "cat woman" – consists of both music and lyrics.

"Gatúbela" is a reggaeton track with sexually charged lyrics in which Karol G sings, "I'm not with anyone but I'm hooked/ I'm elevated, I feel like a Catwoman/ It feels good when he moves my panty to the side/ It feels good when you kiss me down there."[xiv] In this regard, "Gatúbela's" success is attributable, at least in part, to Karol G's status as a sex symbol and as a trailblazing female artist in reggaeton who has marketed the "arrival of female desire."[xv] Regardless, the lyrics of "Gatúbela" cannot possibly infringe "Punto G", because "Punto G" has no lyrics.

#### 2. The Durational Percentage of the Riffs.

"Punto G" is performed at 86 BPM and has total runtime of 3 minutes 27 seconds. The instrumental work consists of 74 bars of music in 4/4 time. The challenged riff is three beats long (three-quarters of a bar) and occurs 18 times, accounting for a total of 13.5 bars. On a bar-count basis, the riff therefore occupies approximately 18% of the total musical content of the track.

- Time signature: 4/4
- Total length of track: 74 bars
- Riff length: three beats (¾ of a bar)
- Number of riff occurrences: 18
- Total bars containing the riff: 13.5 bars
- Percentage of track (by bars) containing the riff: approximately 18%

Gatúbela is performed at 95 BPM and has a runtime of 3 minutes and 29 seconds. It consists of 82 bars in 4/4 time. The riff is three beats[16] long (three-quarters of a bar) and occurs 23 times,

[16] When the vocal sings without the riff, the similarity is actually only two beats. (See Fig. 3). Nonetheless, for simplicity, I have rounded the calculation up to three beats in Plaintiffs' favor.

accounting for a total of 17.25 bars. On a bar-count basis, the riff occupies approximately 21% of the total musical content of the track.

- Time signature: 4/4
- Total length of track: 82 bars
- Riff length: 3 beats (¾ of a bar)
- Number of riff occurrences: 23
- Total bars containing the riff: 17.25 bars
- Percentage of track (by bars) containing the riff: approximately 21%

Notwithstanding the above-referenced professional opinion that the partial similarity between the riffs is ascribable to prior art or coincidence (as opposed to copying), I have been asked to provide a fair and reasonable apportionment calculation based on replicable methods. Again, the quantitative facts:

- "Gatúbela's" 3-beat riff (or similar 2-beat vocal phrase) represents 21% of "Gatúbela's" run time.

- "Punto G's" 3-beat riff represents 18% of "Punto G's" run time.

- "Punto G" is purely instrumental; "Gatúbela" has lyrics. It is a music industry norm for lyrics and music to be considered 50/50 in copyright splits between songwriters.[17]

Consequently, if it were found that "Gatúbela" contained an interpolation of "Punto G's" 3-beat riff, a strictly quantitative apportionment calculation would be as follows:

- A = proportion of "Punto G" represented by the riff = 18%
- B = proportion of "Gatúbela" represented by the riff = 21%
- C = proportion of Gatúbela's songwriting attributable to music (as opposed to lyrics) = 50%

The quantitative apportionment share attributable to the alleged interpolated material is therefore: A × B × C, or 0.18 × 0.21 × 0.50 = 0.0189. Expressed as a percentage, 1.89% of Gatúbela's total compositional interest is attributable to the alleged infringing riff.

Notably, by basing the calculation on quantitative run times, the methodology is replicable. Moreover, it eschews arbitrary and unquantifiable values based on the qualitative importance of one element compared to another. It further bears noting that the calculation skews in Plaintiffs' favor because it does not account for the fact that the Works utilize different chords. If harmony were also factored (*e.g.* as 50% of the melody), this percentage would be cut in half – *i.e.*, A x B

---

[17] For example, the publishing credits for Elton John and Bernie Taupin list exact half-and-half splits between the composer and lyricist respectively. This 50/50 arrangement is a known social norm in songwriter publishing agreements, as documented in my own PhD research: Joe Bennett, "Constraint, Creativity, Copyright and Collaboration in Popular Songwriting Teams" (PhD Thesis, University of Surrey, 2014).

x C x D = 0.009, or less than 1% of "Gatúbela's" compositional interest is attributable to the alleged infringing riff.

However, even if the disputed riff constitutes 1% of "Gatúbela," it does not necessarily equate that 1% of the song's profitability is attributable to any alleged infringement.

**B. The "Qualitative" Assessment.**

**1. Karol G is One of the World's Most Popular Musical Artists, Boasting Nine Works with More Than One Billion Spotify Streams.**

One likely primary driver of "Gatúbela" success is Karol G's star power. Karol G is one of the world's most popular artists, not just in the Latin genre, but across all genres. She has a large, devoted fan base. In 2024, she was the 15th most streamed artist in the world on Spotify,[xvi] with more streams than popular English-speaking artists such as Kendrick Lamar, Coldplay, Justin Bieber, and Rihanna. She has been the most viewed artist on Vevo for 4 consecutive years (2021-2024),[xvii] with 3.57 billion views in 2024, nearly doubling Taylor Swift's total of 1.99 billion.

Karol G has also won several major industry awards, including a Grammy for Best Música Urbana Album, multiple Latin Grammy Awards, Billboard Music Awards, and MTV/AMA honors. She was also named Woman of the Year based, in part, for her role in expanding reggaeton and Latin urban music worldwide and breaking gender barriers in a male-dominated genre.

Since her first top 10 song on the U.S. Latin chart in 2018, "Mi Cama," Karol G has had string of chart-topping songs. Nine of Karol G's musical works have either already surpassed, or are quickly approaching, one billion streams on the popular Spotify music streaming service:

| Song Title | Streams |
|---|---|
| Tusa (featuring Nicki Minaj) | 1.67 billion streams |
| Provenza | 1.624 billion streams |
| Si Ante Te Hubiera Conocido | 1.521 billion streams |
| TQC (with Shakira) | 1.396 billion streams |
| QLona (with Peso Pluma) | 1.353 billion streams |
| "China" (Daddy Yankee, Ozuna, J Balvin, and Anuel AA) | 1.327 billion streams |
| MAMIII (with Becky G) | 1.152 billion streams |
| Amargura | 1.14 billion streams |
| Bichota | 967 million streams |

According to data compiled by Luminate,[18] between January 1, 2018 through November 30, 2025, 92 of Karol G's songs have been streamed in the United States. Of these 92 songs, 89 songs have had more than 1 million streams; 78 had more than 10 million streams; and 40 had more than 100 million streams. "Gatúbela" is only Karol G's 13th most streamed song in the United States.

"Gatúbela" was Karol G's 16th Top 10 on *Billboard's* Hot Latin Songs chart.[xviii] Notably, "Gatúbela" was Karol G's third single release of 2022. It followed the more popular, "MAMIII," as well as the more streamed, "Provenza," the latter of which debuted at Coachella in April of 2022, opened at No. 2 on the *Billboard's* Hot Latin Songs chart, and charted at No. 6 on YouTube's "Top Ten Songs – US."[xix] The popularity of Karol G's past works contribute to the success of "Gatúbela," as existing fans (including those, for example, who stream "Karol G Radio" or related playlists on Spotify), are more likely to stream "Gatúbela."

The song also benefitted from marketing, including Karol G's teasing of the song's release via social media. By way of example, Karol G hyped the release of "Gatúbela" by leaving a voice note to her fans and revealing the single's name and female-inspired artwork through an Instagram post. She later unveiled that "Gatúbela" would feature a surprise guest.[xx] This marketing built anticipation with fans who responded:

- "Karol G hasn't released Gatubela and I already have that song stuck in my head 😩."

- This weekend the ceiling is coming down with a perreo by Karol G and Maldy. Save this tweet."[xxi]

In sum, "Gatúbela" is not an outlier and owes its success, in part, to Karol G's past commercial success, existing fan base, and marketing.

**2. "Gatúbela" Featured the "Surprising Comeback" of Reggaeton Pioneer, Maldy**.

"Gatúbela's" success is also attributable to a surprising vocal performance from Edwin Vázquez Vega *p/k/a* Maldy. Maldy is a heralded Puerto Rican reggaeton artist known both for his role as a founding member of the early-2000s reggaeton duo, "Plan B," and as a solo performer.[xxii]

Maldy's performance on "Gatúbela" marked his highly anticipated return to music after a two-year hiatus. Reviews noted Maldy's performance:

- "With sexually explicit lyrics, the song returns to the dembow characteristic of the 2000s reggaeton with the Puerto Rican member of Plan B, Maldy, who makes himself shine on one of the song's verses."[xxiii]

---

[18] Luminate is a data company that measures and tracks the entertainment industry. *See* https://luminatedata.com/about/

- "The song also provides a nostalgic feel as it's old-school-inspired thanks to the perreo[19] beat as well as the feature by Maldy, who is one of reggaeton's pioneers."[xxiv]

Maldy's large fan base likely brought further attention and appeal to "Gatúbela."

### 3. The "Gatúbela" Video

The official music video for "Gatúbela" has over 622 million views on YouTube. Directed by Pedro Artola, the viral video pays homage to Britney Spears' hit music video for "I'm a Slave 4 U" released in 2001.[xxv] The video created a stir, as it featured the debut of Karol G's fiery red hair and contains steamy visual content that matches the song's lyrics, including couples grinding on each other and women twerking. Pertinent reviews note:

- "The Pedro Artola-directed video opens with the Colombian singer looking at herself in a restroom mirror surrounded by fellow *bichotas*. She then steps into a steamy corridor, where couples are seen *perreando*, and joins an orgy-like dance pile."[xxvi]

- "The video closes with a man showing scratch marks on his obliques, followed by a transition to a scene where Karol G is running away from something. She finally ends up on a beach covered in blood, and the video finally ends by showing a number of cats walking on a patio."[xxvii]

The music video's success likely amplified "Gatúbela's" success.

In short, in assessing the commercial success of "Gatúbela," Karol G's star power, the song's lyrics, the featured performance of Maldy, and the "Gatúbela" music video must be considered. Accordingly, even if musical elements in "Punto G" constituted 1.89% percent of "Gatúbela," it is my opinion that the any shares attributable to the alleged infringement are even less than this percentage, factoring in the qualitative elements discussed in this Report.

I reiterate that, although I have provided an 'attribution percentage' here, this is only for an arithmetical illustration of a *hypothetical* publishing split *if* a short fragment of "Punto G" were to have been interpolated in "Gatúbela". My analysis and Prior Art examples demonstrate that no such interpolation has occurred. In my opinion, the similarity between these short 2-second fragments of melody is a coincidence. The creators of "Gatúbela" did not copy a melodic fragment from "Punto G" because they did not need to – the sequence of notes is a simple 6-7 note gesture that has been used by many musicians in the past. Coincidental similarity can occur in popular music, especially in short excerpts. In my view, and based on the evidence I have provided in this Report, independent creation is by far the most likely explanation for any perceived similarity.

[19] Perreo is a reggaetón-associated dance characterized by rhythmic, repetitive hip and pelvic movements, often danced solo or with partners in close physical proximity, and designed to align closely with the genre's steady beat and sexualized lyrics.

Best regards,

Prof Joe Bennett PhD

# APPENDIX A

## Qualifications and experience

Dr Joe Bennett (Berklee College of Music) has been analyzing and transcribing popular music for international publication since 1994. He has written more than 30 books, including transcription, teaching and reference works (published worldwide by Music Sales Group), and more than 300 articles for Total Guitar magazine and others, relating to classic songs, guitar techniques and songwriting. He is a writer member of PRS for Music and ASCAP, an academic member of the International Association for the Study of Popular Music (IASPM) and the American Musicological Society, and an associate of the Audio Engineering Society and the American Bar Association.

As an academic researcher, Joe's primary area of expertise is the psychology of songwriting and similarity thresholds in popular songs; at Berklee he teaches forensic musicology analysis techniques. His PhD research (University of Surrey, UK) was entitled '*Constraint, Creativity, Copyright and Collaboration in Popular Songwriting Teams*' and it provided the world's first detailed systematic investigation into collaborative songwriters' creative processes. He has published widely, including peer-reviewed research about song analysis and music copyright infringement.[20] Joe was awarded a National Teaching Fellowship (NTF) in 2004 by the UK Higher Education Academy in recognition of his contribution to the teaching and learning of popular music. He is a Fellow of the Higher Education Academy, a peer reviewer for Bloomsbury Publishing, Oxford University Press and IASPM, and a PhD examiner specializing in songwriting creativity.

As a forensic musicologist, Joe's past clients include Universal Music Publishing, Warner/Chappell Music Publishing, APG, 88Rising, DLMDD, JWT, BBH, Loeb & Loeb LLP, Simpson & Marwick LLP, Edwards Wildman Palmer LLP, Swan Turton LLP, and Weber Shandwick, as well as many individual songwriters, publishers, record labels and corporate clients. Recent US litigation includes Hines v. W Chappell Music Corp (SDNY, 2021), Third Side v Evenflo (Ohio, 2023) / Payne v Woods (Louisiana, 2023). Academic presentations include Oxford University, Cambridge University, Berklee College of Music, NYU, and The Copyright Society. Media interviews include The New York Times, The Economist, Rolling Stone, Billboard, NPR, The LA Times, BBC TV, BBC radio, MTV, CNN, Discovery Channel, The Daily Telegraph, and The Guardian. Joe currently co-presents the show "Midnight Musicology with Dr Beat" on BBC national radio.[21] He is listed on the UK Music Publishers' Association's Register of Expert Witness Musicologists and the American Musicological Society's database of forensic musicologists.[22]

[20] https://joebennett.net/publications/
[21] https://joebennett.net/5live
[22] https://www.amsmusicology.org/page/ForensicMusicology

**<u>Selected publications and presentations</u>**:

“We Can Work It Out: Forensic Musicology Methods.” In *Music Borrowing and Copyright Law*, edited by Chen Zhu and Enrico Bonadio. Hart/Bloomsbury, 2023.

Bennett, Joe and O’Connor, Sean. “Determining The Composition: case studies of contemporary songwriters’ creativity”. In *The Oxford Handbook of Music Law and Policy*. Edited by Sean M O’Connor. Oxford University Press. Forthcoming, 2021.

“Wrongful Appropriation and Copyrightability in Music Copyright”. Joe Bennett and Wendy Gordon. *Works-in-Progress Intellectual Property (WIPIP) Colloquium*, Boston University School of Law, February 2017.

“I Hate These Blurred Lines: The Intrinsic Test In Music Copyright Disputes”. Joe Bennett and Wendy Gordon. The 11th Art of Record Production Conference, Aalborg University, Denmark, December 2016.

"Where is creativity? Locating intellectual property in collaborative songwriting and production processes." In *International Association for the Study of Popular Music (IASPM) UK & Ireland*, University College Cork, 12-14 Sept 2014.

“Who Writes the Songs? Creative Practice and Intellectual Property in Popular Music’s Digital Production Chain.” In *Creativity, Circulation and Copyright: Sonic and Visual Media in the Digital Age*, CRASSH Centre For Research In The Arts, Social Sciences And Humanities. Cambridge University 28-29 March 2014

“Forensic Musicology: approaches and challenges.” In *The Timeline Never Lies: Audio Engineers Aiding Forensic Investigators in Cases of Suspected Music Piracy*. Presented at the International Audio Engineering Society Convention. New York, USA, October 2013.

“Two Worlds Collide: originality and plagiarism in songwriting”. International Association for the Study of Popular Music (IASPM) conference, Gijon, Spain, June 2013.

“Applying Melodic Analysis to Infer the Extent of Plagiarism in Popular Song Authorship Disputes.” Popular Music Analysis (PopMAC) conference, University of Liverpool, July 2013.

“Constraint, Collaboration and Creativity in Popular Songwriting Teams.” In *The Act of Musical Composition: Studies in the Creative Process*, David Collins (ed), 139–169. Studies in The Psychology of Music. Ashgate, 2012.

“Collaborative Songwriting – the Ontology of Negotiated Creativity in Popular Music Studio Practice.” *Journal on the Art of Record Production #5*, 2011.

**INDEX OF AUDIO EXHIBITS**

The asset name [BENNETTXX…] is in the **Title** column. Or go directly to each recording and click in the **Link** column.

All can be accessed at https://joebennett.work/HERNANDEZ-ASSETS.

| Title | Artist | Year | Link | Timestamp | Notes |
|---|---|---|---|---|---|
| Gatúbela [BENNETT01] | Karol G | 2022 | Audio | N/A | Full song |
| Punto G [BENNETT02] | Alfr3d | 2022 | Audio | N/A | Full song |
| The Nutcracker Suite Op. 71a: IIa March [BENNETT03] | Pyotr Ilyich Tchaikovsky | 1892 | Audio excerpt | 01:09 | Prior Art - melody |
| Tú me Dijiste Adiós [BENNETT04] | Los Brincos | 1964 | Audio excerpt | 00:11 | Prior Art - melody |
| L'Italiano [BENNETT05] | Toto Cutugno | 1983 | Audio excerpt | 01:04 | Prior Art - melody |
| Eläköön elämä [BENNETT06] | Sonja Lumme | 1985 | Audio excerpt | 00:22 | Prior Art - melody |
| Sons and Daughters [BENNETT07] | IRON BELL MUSIC Ft. Joel Gerdis | 2017 | Audio excerpt | 00:12 | Prior Art - melody |
| Marrandil [BENNETT08] | Gurrumul | 2020 | Audio excerpt | 00:15 | Prior Art - melody |
| Nevo Jerusalem [BENNETT09] | In His Presence Ministries | 2021 | Audio excerpt | 01:01 | Prior Art - melody |
| When Will Tomorrow Come? [BENNETT10] | Ian Luxton | 2021 | Audio excerpt | 00:24 | Prior Art - melody |
| Un Poblano En Texas [BENNETT11] | Grupo Los Chupetones | 2021 | Audio excerpt | 00:05 | Prior Art - melody |
| Tsukiyo [BENNETT12] | Chemistry | 2021 | Audio excerpt | 01:00 | Prior Art - melody |
| Volaré [BENNETT13] | Carmelitas Contemplativos | 2022 | Audio excerpt | 00:20 | Prior Art - melody |
| Half-Breed [BENNETT14] | Cher | 1973 | Audio excerpt | 00:34 | Prior Art – chord progression |
| Independent Women, Pt. 1 [BENNETT15] | Destiny's Child | 2001 | Audio excerpt | 00:38 | Prior Art – chord progression |
| The Importance of Being Idle [BENNETT16] | Oasis | 2005 | Audio excerpt | 0:09 | Prior Art – chord progression |
| I Didn't Change My Number [BENNETT17] | Billie Eilish | 2021 | Audio excerpt | 0:09 | Prior Art – chord progression |

---

[i] Additional transcriptions and research: Rafael Waters BM (Music), Dasom Chung BM (Music), Dr. John Pierce O'Reilly (DPhil Music, Oxon).
[ii] *See* "Harmony" in *Harvard* and *The New Grove Dictionary of Music and Musicians* (Oxford University Press, Second Edition, 2001, Vol. 10, p. 858) (hereinafter, "*Grove*").
[iii] *See* "Harmonic rhythm" in *Harvard* (p. 376) and *Grove* (Vol. 10, p. 854).
[iv] *See* "Key" in *Harvard*, p. 442.
[v] *See* "Rhythm" in *Harvard* (p. 723) and *Grove* (Vol. 21, p. 277).
[vi] *See* "Melody" in *Harvard* (p. 499) and *Grove* (Vol. 16, p. 363).
[vii] https://www.britannica.com/dictionary/riff (defining riff as "a short and usually repeated pattern of notes in a song").
[viii] https://www.loopcloud.com/cloud/blog/5253-8-Common-Chord-Progressions
[ix] https://musictheory.pugetsound.edu/mt21c/ThreeTwoClave.html
[x] https://musictheory.pugetsound.edu/mt21c/ThreeTwoClave.html.
[xi] Katherine M. Leo, "Prior Art: Forensic Evidence of Musical Originality in Copyright Litigation," *Journal of the American Musicological Society* 77, no. 2 (2024): 303–33, https://doi.org/10.1525/jams.2024.77.2.303.
[xii] Joe Bennett, "We Can Work It Out: Forensic Musicology Methods," in *Music Borrowing and Copyright Law*, ed. Chen Zhu and Enrico Bonadio (Hart/Bloomsbury, 2023).
[xiii] https://www.umusicpub.com/us/Artists/F/Feid.aspx
[xiv] https://hypebae.com/2022/8/karol-g-gatubela-era-new-song-music-video-feature-maldy-plan-b-old-school-reggaeton-perreo-beat
[xv] https://los40.us/2024/talking-sex-in-music-the-impact-of-karol-g-other-latin-divas-17454.html
[xvi] https://chartmasters.org/spotify-most-streamed-artists-2024/
[xvii] https://routenote.com/blog/2024-on-vevo/
[xviii] https://www.billboard.com/music/chart-beat/karol-g-maldy-gatubela-debuts-top-10-hot-latin-songs-1235134981/
[xix] *Id.*
[xx] https://remezcla.com/music/karol-g-teases-new-single-gatubela-here-are-the-first-reactions/
[xxi] *Id.*
[xxii] https://www.billboard.com/music/latin/maldy-karol-g-gatubela-song-stories-1235141639/
[xxiii] https://aldianews.com/en/culture/music/karol-g-premieres-gatubela
[xxiv] https://hypebae.com/2022/8/karol-g-gatubela-era-new-song-music-video-feature-maldy-plan-b-old-school-reggaeton-perreo-beat
[xxv] https://remezcla.com/music/watch-karol-g-channels-britney-spears-in-fierce-gatubela-music-video/
[xxvi] https://www.rollingstone.com/music/music-latin/karol-g-releases-gatubela-maldy-1234582023/
[xxvii] https://uproxx.com/music/karol-g-maldy-gatubela-video/